IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

LENORA YOUNG                                                    PLAINTIFF

                    v.                    Civil No. 07-3016

MICHAEL J. ASTRUE, Commissioner
Social Security Administration                                  DEFENDANT

## MEMORANDUM OPINION

Plaintiff, Lenora Young, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (Commissioner) denying her claims for period of disability, disability insurance benefits (DIB), and supplemental security income ("SSI") pursuant to Titles II and XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§ 416(i) and 423. In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

## Procedural Background

The plaintiff filed her applications for DIB and SSI on July 28, 2004, alleging an onset date of December 23, 2002, due to scoliosis, a pinched sciatic nerve, bipolar disorder, post traumatic stress disorder ("PTSD"), and attention deficit hyperactivity disorder ("ADHD"). (Tr. 51-53, 107, 328-331). An administrative hearing was held on June 21, 2006. (Tr. 352-403). Plaintiff was present and represented by counsel.

At the time of the administrative hearing, plaintiff was 41 years old and possessed a tenth grade education. (Tr. 11, 234). The record reveals that she had past relevant work experience

("PRW") as a telemarketer, general office clerk, courter clerk, fast food worker, and stock clerk. (Tr. 118, 397).

On February 13, 2007, the Administrative Law Judge ("ALJ") determined that plaintiff suffered from a combination of severe impairments, but did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. (Tr. 19). After partially discrediting plaintiff's subjective complaints, the ALJ determined that plaintiff retained the residual functional capacity ("RFC") to stand thirty minutes at a time; walk one quarter mile at a time; sit one hour at a time with the opportunity to alternate positions throughout an eight-hour workday; lift and/or carry twenty pounds frequently and ten pounds occasionally; push and/or pull occasionally; balance frequently; climb stairs and ramps; and, stoop, kneel, crouch, crawl, and reach overhead occasionally, but could not climb ladders, ropes or scaffolds or use hands on a repetitive basis throughout an eight-hour work day. The ALJ further found that plaintiff could perform a routine, low stress, simple to semi-skilled job not requiring a lot of judgment, decision-making, or dealing with a large number of people, including coworkers, at any one time. (Tr. 20). The ALJ then concluded that plaintiff could return to her PRW as a general office clerk. (Tr. 34).

The plaintiff appealed this decision to the Appeals Council, but her request for review was denied on April 27, 2007. (Tr. 6-8). Subsequently, plaintiff filed this action. (Doc. # 1). This case is before the undersigned by consent of the parties. Both parties have filed appeal briefs, and the case is now ready for decision. (Doc. # 7, 8).

**Applicable Law**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

3

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. *See* 20 C.F.R. §§ 404.1520, 416.920. Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §§ 404.1520, 416.920.

## Evidence Presented

On March 11, 2002, plaintiff was diagnosed with abdominal pain of unknown etiology. (Tr. 173-74). Imaging of the chest indicated that a tiny amount of pleural effusion on the right could not be excluded. Otherwise, it was an unremarkable exam. (Tr. 175).

On March 12, 2002, plaintiff complained of abdominal pain. (Tr. 171). The previous evening, she had been diagnosed with a probable viral syndrome. Dr. Robert Harper diagnosed her with acute resolving abdominal pain, probably of viral etiology. (Tr. 171).

From August 2002 until September 12, 2002, plaintiff participated in physical therapy. (Tr. 135-137).

On December 31, 2002, plaintiff was treated for swelling and pain in her right hand after injuring her wrist approximately five days prior. X-rays of the wrist were negative. (Tr. 170). There was, however, a possible small avulsion on the proximal end of the fifth metacarpal. (Tr.

4

172). An examination revealed mild tenderness over the distal one-third of the radius of the right forearm and moderate swelling and tenderness centered primarily over the extensor tendons of the thumb. Dr. Kevin McCafferty diagnosed plaintiff with right forearm muscle strain and extensor tendon tenosynovitis of the thumb. He prescribed a thumb and wrist splint and Vicodin. (Tr. 170).

On January 9, 2003, plaintiff was referred to Dr. Charles Jennings regarding pain in her right hand associated with swelling and limited finger movement. (Tr. 182-183). An examination revealed no swelling, but only 30 degrees of flexion and extension in the wrist. Dr. Jennings concluded that plaintiff suffered a sprain in the region of her first dorsal compartment. He had her consult with a hand therapist for extensive instruction in massage and desensitization as well as range of motion exercises. By the end of the session she was able to flex her fingertips to within 1 centimeter on the distal palmar crease, a marked improvement from the pretreatment range of motion. As such, Dr. Jennings encouraged plaintiff to continue this program. (Tr. 182).

On January 13, 2003, plaintiff had improved since her last visit with Dr. Jennings. (Tr. 181-182). She had a full range of motion in her fingers with full mobility of her thumb. There was no tenderness on the volar aspect of the carpometacarpal joint of the thumb. Dr. Jennings opined that it was possible that plaintiff had strained the abductor pollicis longus tendon significantly and that it would just take more time for the muscle to heal. He prescribed Bextra and encouraged plaintiff to use her hand as vigorously as she could. (Tr. 181)

On January 20, 2003, Dr. Jennings reported that plaintiff was somewhat improved, but still in pain. (Tr. 181). She had not returned to work because she was reportedly given a lifting restriction. The range of motion in her wrists was equal, although she had some discomfort at

5

the extreme of wrist extension. Plaintiff was prescribed occupational therapy. The doctor thought the matter would resolve itself with time. (Tr. 181)

On January 27, 2003, Dr. Jennings noted that plaintiff was essentially unimproved and complained of pain that kept her awake at night that involved the thumb/index area of her hand and the intersection area of her distal radius. (Tr. 180-181) Plaintiff had give-way weakness, trouble lifting and gripping, pain on the dorsal aspect of the wrist, tingling involving her thumb and index finger, sensitivity to the median nerve in the volar aspect of the right wrist, and visible and palpable swelling in the intersection area of her right wrist. Although puzzled by her symptoms, Dr. Jennings indicated that she could be suffering from intersection syndrome. However, he wanted to rule out the possibility of carpal tunnel syndrome, and ordered nerve conduction studies. Dr. Jennings also ordered a three-phase bone scan. He indicated that he would consider steroid injections into the intersection area if the studies were negative. (Tr. 180).

On February 7, 2003, results of a nerve conduction/EMG study were normal with no electrodiagnostic evidence of right distal median neuropathy or more diffuse sensory motor polyneuropathy. (Tr. 145-150). There was also no evidence of right distal ulnar neuropathy. (Tr. 145-150).

On February 10, 2003, plaintiff had a triple phase bone scan of her hands and wrists. The results were "probable normal." (Tr. 143-144).

On February 24, 2003, plaintiff reported significant improvement in her hands. (Tr. 180). Although the numbness in her hands had improved, she reported some acute swelling in her right little metacarpal ("MP") joint. Plaintiff also continued to experience crepitation. A physical

6

examination revealed some diffuse swelling in the MP joint of her right little finger, but a full range of motion.  An x-ray showed no evidence of acute injury.  Dr. Jennings stated that "[t]his event plus the problem that she has had in the forearm makes me wonder about some type of collagen disease causing this problem."  As such, he order laboratory tests and placed her on Mobic.  Dr Jennings also prescribed occupational therapy for progressive strengthening in anticipation of her returning to her job.  (Tr. 180).

On March 2, 2003, plaintiff sought emergency treatment with complaints of a cough, congestion, rhinorrhea, general aches and fatigue, and some pleuritic chest discomfort.  (Tr. 168).  Chest x-rays showed no significant change in the chest since her last x-ray in July 2001, and also revealed scoliosis.  (Tr. 142).  The doctor diagnosed her with acute bronchitis.  (Tr. 169).

On March 10, 2003, plaintiff indicated that she was feeling a little bit better.  (Tr. 178-179).  She continued to have some stiffness and swelling in her little finger, which had improved since her last visit, and achiness over the intersection area of her forearm.  Further, lab tests revealed a positive rheumatoid screen.  Dr. Jennings noted that her rheumatoid tider was still pending.  He prescribed occupational therapy to see if this would be of some benefit to her.  (Tr. 178-79).

On March 21, 2003, plaintiff was discharged from physical therapy.  (Tr. 123).  Records indicate that she had met her goals and returned to work, albeit a job different from her previous employment.  (Tr. 123).  Treatment notes reveal that plaintiff had been initially evaluated for physical therapy on March 19, 2003.  (Tr. 127).

On March 24, 2003, plaintiff indicated that she was making some improvement although she remained weak and sore.  (Tr. 179).  Dr. Jennings did not observe any swelling around her

7

little finger MP joint as he had seen in the past.  Accordingly, Dr. Jennings released her to return to light duty work.  (Tr. 179)

On March 26, 2003, plaintiff cancelled her occupational therapy session scheduled for the following Thursday.  (Tr. 121).  Records indicate that plaintiff was seen for a total of 5 therapy session, missing at least one appointment per week due to transportation problems and illness.  Therapy notes reveal that plaintiff continued to experience pain in her right wrist, which she rated between a 4 and a 7 on a ten point scale.  Although her swelling had significantly improved, it was noted that the swelling increased with work load.  Plaintiff indicated that she had returned to her regular routine at home, but continued to have difficulty picking up a jug of milk with just one hand.  As such, she was discharged from therapy.  (Tr. 121).  Records indicate that plaintiff had begun occupational therapy in January 2003.  (Tr. 134).

A discharge note from Occupational Therapy dated this same date documented improved grip strength in plaintiff's left hand.  Plaintiff indicated that she was going back to work and could deal effectively with pain flare ups in her right hand.  She was utilizing a wrist splint for heavy lifting and was instructed to apply ice in the event of a flare up.  (Tr. 121).

On August 13, 2003, plaintiff sought treatment for an injury to her left forearm resulting from a fall two days previously.  (Tr. 166).  She was diagnosed with a superficial laceration to the left forearm, a contusion of the left forearm, and cellulitis of the left forearm (early).  (Tr. 167).  An x-ray of the left forearm was normal, showing no fractures, dislocations, or subluxation.  (Tr. 141).

On October 20, 2003, plaintiff complained of right side abdominal pain with no nausea, vomiting, diarrhea, or loss of appetite.  (Tr. 164).  Records indicate that she was grossly

8

intoxicated and with a friend who was convinced that plaintiff had appendicitis.  However, plaintiff was diagnosed with abdominal pain of an unknown cause.  She was advised to take Tylenol or Ibuprofen for pain.  (Tr. 165).

On October 24, 2003, plaintiff returned with complaints of abdominal pain but appears to have left the hospital against medical advice.  (Tr. 163).

On May 28, 2004, plaintiff established with Dr. Nora Norum of the City-County Health Department.  (Tr. 232).  Plaintiff was diagnosed with viral pharyngitis and told to drink plenty of fluids, rest, and take Tylenol and Motrin.  (Tr. 232)

On July 1, 2004, plaintiff sought treatment for back pain.  (Tr. 160).  An examination revealed a moderately limited range of motion in the back with decreased flexion, extension, right lateral bending, left lateral bending and rotation to the right and left, scoliosis, and left sacroiliac joint ("SI") tenderness.  Plaintiff was diagnosed with acute cervical strain, chronic left-sided lumbar radiculopathy, and acute pain in the neck and lower back (with radiation to the left leg).  (Tr. 161).  The emergency room doctor prescribed Naproxen and Flexeril and advised plaintiff not to perform strenuous activities, bend, stoop, sit for a prolonged period of time, or lift anything greater than 20 pounds.  (Tr. 162).

On July 15, 2004, Dr. Norum diagnosed plaintiff with bilateral SI joint pain.  (Tr. 231).  Plaintiff indicated that Flexeril and Naprosyn helped "a little bit," but did not completely resolve her pain.  An examination revealed pain in the SI joints with palpation and pain radiating into the muscles and buttocks.  Dr. Norum prescribed epidural steroid injections to treat plaintiff's pain.  The first of which was scheduled for the following week.  Plaintiff also told Dr. Norum

9

that she was supposed to be on Lithium and was advised to schedule an appointment with Dr.

Norum for a complete mental evaluation. (Tr. 231).

On July 22, 2004, Dr. Norum assessed plaintiff with back pain and stated that it was

musculoskeletal in nature and would eventually resolve. (Tr. 229). She prescribed Celebrex in

lieu of the Naprosyn. Plaintiff indicated that she wanted to make a future appointment to discuss

her depression. (Tr. 229).

On July 22, 2004, plaintiff received emergency treatment for dyspnea and wheezing. (Tr.

157-158). She also complained of severe back pain that she could not get under control. (Tr.

157). An examination revealed normal breath sounds and no respiratory distress. Plaintiff was

diagnosed with lumbar strain with sciatica and a drug interaction between alcohol and a double

dose of Celebrex. She was given a Prednisone for the inflamation and allergic reaction. Further,

the doctor advised her to refrain from strenuous activity and to apply heat and warm soaks to the

affected area. (Tr. 158).

This same date, plaintiff sought treatment for continued lower back pain that was

radiating into her upper back. (Tr. 229-230). Plaintiff had previously been prescribed Naprosyn,

which was causing an upset stomach. Although plaintiff reported a history of severe scoliosis,

Dr. Norum stated that she did not appreciate it to be particularly severe. Dr. Norum was of the

opinion that plaintiff's back pain was musculoskeletal in nature and would resolve. For this, she

prescribed Celebrex. Plaintiff indicated that she was also experiencing some symptoms of

depression, and was advised to schedule another appointment to address these issues with Dr.

Norum. (Tr. 229).

10

On July 28, 2004, plaintiff presented to the ER with complaints of chronic back pain. (Tr. 154-156).  She described the pain as a sharp and burning sensation exacerbated by movement of the trunk and neck, cough, and deep breaths.  An examination revealed severe soft tissue tenderness in the left lower thoracic area and left upper, middle, and lower lumbar areas. Severe muscle spasm was also present in the left lower thoracic area with a moderately limited range of motion in the thoracic spine and decreased flexion, extension, right lateral bending, and left lateral bending and rotation to the right and left.  The doctor diagnosed her with chronic back pain and acute exacerbation of sciatica.  (Tr. 155).  Plaintiff was told not to lift greater than 5 pounds or bend, stoop, sit for a prolonged period of time, or perform any strenuous activities. She was given injections of Toradol and Phenergan and released to return to work in 2 days.  (Tr. 155).

On July 30, 2004, plaintiff continued to complain of chronic, progressive back pain.  (Tr. 151-153).  She stated that her pain had been present for several months and had worsened, despite the use of Celebrex and Ultracet.  (Tr. 151).  Plaintiff also reported left arm numbness and loss of sensory capacity in that arm.  X-rays of her cervical spine showed minimal degenerative disc space height loss at the C5-6 level, while x-rays of her lumbosacral spine revealed marked apex left levorotoscoliosis.  (Tr. 139-140).  Further, an examination revealed a decreased grip strength on the left side.  The doctor diagnosed her with cervical radiculopathy, chronic back pain (probably related to scoliosis), and acute lumbar strain.  She was advised to refrain from lifting over 5 pounds and told to avoid activities requiring bending, stooping, and prolonged sitting for at least 10 days.  Further, the doctor advised her not to perform any

11

strenuous activity or return to work for two weeks.  He then prescribed Vicodin, Naproxen, and Flexeril to replace her previous pain medications.  (Tr. 153).

On August 2, 2004, an MRI of plaintiff's cervical spine showed minimal degenerative disc disease without neuroforaminal or spinal stenosis.  (Tr. 138).

On August 3, 2004, plaintiff was treated by Dr. Michael A. Dube for complaints of neck pain that radiated into her arm.  (Tr. 178-179).  She denied any recent injuries.  Plaintiff told Dr. Dube that she had experienced pain in her back and legs her entire life and that she believed she was suffering from rheumatoid arthritis, although she had not been prescribed any medication for this.  Plaintiff also reported occasionally numbness in her hands.  A physical examination revealed left lumbar and right thoracic scoliosis, good lateral bending and side bending, tenderness at the cervicothoracic junction, an excellent range of motion, intact sensation and motor skills, nonpainful figure-four testing, and intact reflexes.  X-rays showed scoliosis and an MRI revealed no evidence of foraminal stenosis or central stenosis with only mild degenerative changes.  Dr. Dube diagnosed her with chronic leg and back pain with some recent arm and neck pain.  He opted to treat her conservatively via anti-inflammatory medications and physical therapy.  Dr. Dube opined that plaintiff could return to work when she completed her physical therapy.  (Tr. 178).

Records dated from August 9, 2004, through April 7, 2006, indicate that plaintiff participated in mental health services at Golden Triangle Community Mental Health. (Tr. 276-323).  Dr. Patricia Calkin, a psychiatrist, diagnosed plaintiff with bipolar disorder, PTSD, major depressive disorder, and a history of borderline personality disorder.  Plaintiff's global assessment of functioning score was noted to be 60 in April 2005.  (Tr. 297).  Dr. Calkin

12

prescribed Lithium, Effexor, Depakote, and Topamax.  Progress notes indicate that plaintiff responded pretty well, but at times, thought she was doing poorly.  During this time period, the records indicate that plaintiff was dealing with issues related to her children being removed from her home by state authorities.  (Tr. 276-323).

On August 27, 2004, plaintiff was evaluated by Dr. Norum for bipolar disorder.  (Tr. 227).  She indicated that she had taken medication for this condition in the past, namely Seroquel and Prozac, but that neither helped her condition and both caused her to gain weight.  When asked about her most prominent symptom, plaintiff stated that she was "sluggish all the time, [was] unmotivated to do anything, and she also [got] very crabby and irritable very easily."  Dr. Norum prescribed Symbiax.  Because plaintiff was now seeing Dr. Dube regarding her back pain, Dr. Norum refused to prescribe any pain medications for this condition.  (Tr. 227).

On September 10, 2004, Dr. Norum released plaintiff to return to work.  (Tr. 225).  On September 13, 2004, plaintiff stated that the Symbiax made her feel more depressed and increased her appetite.  (Tr. 224).  She voiced her desire to get on Pharmacy Assistance for monetary assistance in obtaining her Naproxen and anti-depressant medications.  Dr. Norum opted to prescribe Effexor XR and to hold off on prescribing a mood stabilizer unless plaintiff reported continued problems in this area.  The doctor indicated that what plaintiff described as bipolar may actually be anxiety.  (Tr. 224).

On September 23, 2004, plaintiff was evaluated by Dr. Betsy Rushworth, a psychologist.  (Tr. 199).  Plaintiff alleged disability due to scoliosis, a pinched sciatic nerve, mental problems, bipolar disorder, PTSD, and ADHD.  She indicated that she was taking Naproxen, Flexeril, and Effexor.  (Tr. 196).  During the exam, plaintiff made no further mention of her ADHD and Dr.

13

Rushworth saw no signs of it. (Tr. 198). She did, however, think it advisable to order intellectual functioning to ascertain plaintiff's true IQ level. Although plaintiff reported a history of PTSD, Dr. Rushworth could find no indications of this during the interview. Dr. Rushworth's main concern was plaintiff's depression, which appeared to be exacerbated by the fact that plaintiff had lost her job over the summer and had suffered considerable damage due to prior physical abuse. Dr. Rushworth diagnosed plaintiff with major depressive disorder, specific phobia, social phobia, and pain disorder associated with both psychological factors and a general medical condition. She noted that plaintiff's global assessment of functioning score was 58, and her prognosis was guarded. (Tr. 199).

On October 4, 2004, plaintiff and her significant other reported improvement in her bipolar due to the addition of Effexor. (Tr. 224). Her blood work also revealed that she was "a little bit hypothyroid." Dr. Norum indicated that plaintiff was "well-appearing" and had a couple of puncture wounds on her right forearm due to a cat bite. Although slightly warm to the touch, there were no streaks of radiation away from it. Dr. Norum gave plaintiff samples of Effexor and Synthroid, as well as Doxycycline. Plaintiff could not catch the cat again, so it was impossible to determine her risk of contracting rabies from the bite. (Tr. 223).

On October 25, 2004, plaintiff returned for a follow-up concerning her bipolar disorder. (Tr. 223). Although plaintiff had previously reported improvement on Effexor XR, she stated that she was not doing as well, and wanted to increase her dosage. Dr. Norum ordered an MRI. (Tr. 223).

14

On November 1, 2004, an MRI of the lumbar spine showed extensive left lumbar scoliosis with associated facet arthropathy, especially in the lower three lumbar segments. (Tr. 236, 275). However, no focal area of impingement was demonstrated. (Tr. 236, 275).

On November 23, 2004, plaintiff was diagnosed with depression and chronic lower back pain. (Tr. 222). After reviewing her MRI results, Dr. Norum voiced her doubts that anything could be done to alleviate plaintiff's back pain, as her condition was probably musculoskeletal in nature. Accordingly, she gave plaintiff a six week supply of Effexor and advised her to continue using Flexeril. (Tr. 222).

On December 9, 2004, plaintiff requested Synthroid samples stating that she had been out of medication for 4 days. (Tr. 221).

On January 18, 2005, progress records indicate that plaintiff was being treated for depression and hypothyroid. (Tr. 220). Dr. Norum noted plaintiff's "usual state of helplessness and inability to function and quite frankly pathetic behavior." She then prescribed Effexor XR and Synthroid. (Tr. 220).

On March 21, 2005, plaintiff complained of head congestion, ear pain, cough, chronic lower back, hip pain, and neck pain. (Tr. 258). Dr. Julie Wood assessed her with hypothyroidism, sinusitis, a history of asthma, depression, and questionable fibromyalgia. She then increased plaintiff's dosage of Synthroid, prescribed Amoxicillin, and advised plaintiff to exercise and get adequate sleep. (Tr. 258).

On April 14, 2005, Dr. Calkin evaluated plaintiff. (Tr. 295-297). She diagnosed plaintiff with bipolar II disorder, PTSD, ADHD by history, and borderline personality disorder by history.

15

Dr. Calkin prescribed Lithium and directed plaintiff to continue taking the Effexor.  She also assessed plaintiff with a Global Assessment of Functioning score of 60.  (Tr. 297).

On May 2, 2005, plaintiff was treated by Dr. Wood.  (Tr. 254).  Plaintiff stated that Dr. Calkin had prescribed Lithium, but that she was unable to take it.  Therefore, Depakote had been substituted for the Lithium.  Plaintiff complained of continued back pain.  She and her boyfriend believed that she was suffering from fibromyalgia, and Dr. Wood agreed that this was "probably as good a working diagnosis as any."  Therefore, she diagnosed plaintiff with bipolar disorder and questionable fibromyalgia.  (Tr. 254).

On May 19, 2005, plaintiff reported increased swelling and sleep with the increased dosage of Synthroid.  (Tr. 252-253).  However, Dr. Wood did not believe that plaintiff's thyroid was responsible for these symptoms.  An examination revealed some tenderness over the occiput posteriorly, trapezius bilaterally, medial epicondyle, SI joints, and ankles.  Dr. Wood assessed plaintiff with stable hypothyroidism, bipolar disorder, dyslipidema, and probable fibromyalgia.  She then prescribed Pravachol to treat plaintiff's dyslipidema.  (Tr. 252).

On June 17, 2005, plaintiff was treated for complaints of left foot and ankle swelling.  (Tr. 248-249).  She also complained of lower back pain.  Dr. Wood again diagnosed her with controlled hypothyroidism, bipolar disorder, dyslipidema, chronic back pain with questionable fibromyalgia, pedal edema, and mild liver enzyme elevation.  The doctor advised plaintiff that she should continue monitoring her diet and exercising.  Dr. Wood also stated that plaintiff should be walking 2 miles per day by the end of the summer to help alleviate her back pain.  (Tr. 248-249).

16

AO72A
(Rev. 8/82)

On October 26, 2005, plaintiff presented to Dr. Wood's office for a complete physical. (Tr. 247). She complained of numbness and tingling in her right hand, and an examination revealed a positive Tinel's sign in the right wrist. (Tr. 247). Dr. Wood diagnosed her with possible carpal tunnel syndrome of the right hand for which she was given an ace bandage and splint. She also diagnosed plaintiff with stable hypothyroidism, bipolar disorder, dyslipidema, chronic back pain presumed fibromyalgia, and mild liver enzyme elevation. (Tr. 246-247).

On December 6, 2005, Dr. Wood diagnosed plaintiff with hyperlipidemia, bipolar disorder, dyspepsia, chronic back pain, and hypothyroidism. (Tr. 244). A fasting chemical panel was ordered to assess plaintiff's true glucose level, as previous testing had revealed higher than normal values. Further, because plaintiff was having dyspepsia, Dr. Wood prescribed Pepcid. She also advised plaintiff to continue exercising, watching her diet, and losing weight. Plaintiff's medications included Effexor, Depakote, Topamax, Pravachol, Naprosyn, and Synthroid. (Tr. 244).

On January 5, 2006, plaintiff stated that she had begun to take Prevacid with the Naprosyn and was feeling much better. (Tr. 243). However, over the previous few days, she had developed a headache and gastrointestinal symptoms including diarrhea without fever, nausea, or vomiting. Dr. Wood diagnosed her with viral gastroenteritis, hyperlipidemia, bipolar disorder, chronic lower back pain presumably fibromyalgia, hypothyroidism, dyspepsia and a strong family history of diabetes. (Tr. 243).

On January 31, 2006, plaintiff was diagnosed with probable irritable bowel syndrome, hyperlipidemia, medication induced dyspepsia, hypothyroidism, chronic lower back pain felt to be representative of fibromyalgia, and bipolar disorder. (Tr. 241). Plaintiff indicated that Dr.

17

Calkin had taken her off of the Depakote and prescribed Topamax in its place.  She was also trying to exercise more and felt that things were going "reasonably well."  Records indicate that plaintiff had lost 4 pounds.  Dr. Wood prescribed fiber, fluids, exercise, diet, and weight loss.  She also told plaintiff to take a proton pump of her choice to control the dyspepsia.  (Tr. 241).

On April 4, 2006, plaintiff presented to Dr. Wood's office for a follow-up.  (Tr. 240).  She indicated that she was doing okay, but was experiencing problems with her left shoulder.  Plaintiff also reported some numbness and tingling in her hands and feet, which she thought could be secondary to the Topamax.  An exam documented a decreased range of motion in the shoulder with abduction, flexion, and internal rotation and marked tenderness to palpation over the left trapezius.  Dr. Wood diagnosed her with left shoulder pain and a decreased range of motion, hypothyroidism, hyperlipidemia, chronic back pain felt to be more representative of fibromyalgia, bipolar disorder, and paresthesias.  Despite the paresthesias, however, plaintiff was doing so well on the Topamax that she did not want to change medications.  Therefore, Dr. Wood opted to watch her.  She also prescribed Flexeril, Synthroid, and Pravachol, as well as exercise and weight loss.  (Tr. 240).

On June 8, 2006, plaintiff complained of back pain, fatigue, pain and numbness in her right hand, and problems holding and gripping with her right hand.  (Tr. 324).  Dr. Wood assessed hypothyroidism, hyperlipidemia, bipolar disorder, chronic back pain felt to be fibromyalgia, paresthesias, and hand pain.  She prescribed Synthroid and Pravachol, and advised plaintiff to continue taking the medications prescribed by Dr. Calkin.  Dr. Wood also prescribed a hand splint to be worn nightly and anti-inflammatories.  (Tr. 324).

18

On January 23, 2007, progress notes indicate that plaintiff was diagnosed with chronic headaches, hypothyroidism, back pain, and chronic pain.  (Tr. 346).  Her medications were Amitriptyline, Synthroid, and Flexeril.  (Tr. 346).

On February 13, 2007, plaintiff complained of headaches, continuous back pain that interfered with her housework, and high cholesterol.  (Tr. 345).  She was diagnosed with fibromyalgia, bipolar disorder, and high cholesterol.  The doctor prescribed Topamax, Effexor, Lovastatin, Flexeril, Piroxicam, exercise, and Mucinex.  (Tr. 345).

On February 27, 2007, plaintiff was diagnosed with headaches, allergies, and back pain. The progress note contains minimal information.  Plaintiff was, however, given prescriptions for Effexor, Synthroid, Naproxen, and Topamax.  (Tr. 342).

**Discussion**

We first address the ALJ's assessment of plaintiff's subjective complaints.  The ALJ was required to consider all the evidence relating to plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) plaintiff's daily activities; (2) the duration, frequency, and intensity of her pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of her medication; and, (5) functional restrictions.  *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).  While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole.  *Id*.  As the United States Court of Appeals for the Eighth Circuit recently observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).

19

After reviewing the record, we believe that the ALJ adequately evaluated the factors set forth in *Polaski*, and conclude there is substantial evidence supporting his determination that plaintiff's complaints were not fully credible. The testimony presented at the hearing as well as the medical evidence contained in the record are inconsistent with plaintiff's allegations of disability.

The record does reflect that plaintiff was diagnosed with chronic lower back, neck, and shoulder pain and probable fibromyalgia. It is clear that plaintiff has sought fairly consistent treatment for these conditions. However, we note that her doctors have consistently prescribed conservative treatment for her physical condition. Exercise, increased sleep, and muscle relaxers have all been used to help alleviate plaintiff's discomfort. *See Gowel v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (holding fact that physician prescribed conservative treatment weighed against plaintiff's subjective complaints). Plaintiff's condition has not required hospitalization or the prescription of narcotic pain medications. Further, there is no indication in the record that plaintiff's treating doctors have given her any permanent activity restrictions. *See Baldwin v. Barnhart*, 349 F.3d 549, 557 (8th Cir. 2003) (noting none of plaintiff's independent physicians restricted or limited her activities). As such, we do not find her condition to be as disabling as alleged.

As for plaintiff's dyslipidema and hypothyroidism, her doctors have prescribed medication to treat these impairments. Dr. Wood has repeatedly noted that plaintiff's hypothyroidism was stable or controlled via medication. There is no evidence to indicate that plaintiff's dyslipidema was unresponsive to the medication prescribed, when plaintiff took it

20

regularly.  *See Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995) (holding that a condition that

can be controlled or remedied by treatment cannot serve as a basis for a finding of disability).

It is also clear from the evidence that plaintiff suffers from several mental impairments

to include bipolar II disorder, PTSD, ADHD, and borderline personality disorder.  The most

recent medical evidence indicates that plaintiff has responded well to the addition of Effexor to

her medication regimen.  *Id*.  While there is also evidence to suggest that plaintiff's depression

symptoms have waned and waxed over the years, her condition has not required hospitalization

and no episodes of decompensation have been noted.

Perhaps most compelling, though, is the fact that plaintiff has worked since her alleged

onset date.  Earnings records reveal that plaintiff performed work in 2003 and 2004.  While we

agree with the ALJ's determination that all of this work may not have risen to the level of

substantial gainful activity ("SGA"), we do believe that it evidences her ability to perform some

level of work-related activity.  *See* 20 C.F.R. § 404.1571 ("Even if the work you have done was

not substantial gainful activity, it may show that you are able to do more work than you actually

did.  We will consider all of the medical and vocational evidence in your file to determine

whether or not you have the ability to engage in substantial gainful activity.").  We note,

however, that the ALJ did conclude that a portion of this work constituted SGA, which prevents

plaintiff from obtaining disability benefits during that time frame.

Plaintiff's own reports concerning her activities of daily living also contradict her claim

of disability.  On her adult function report, plaintiff reported the ability to care for her personal

hygiene with some limitations, prepare frozen foods, wash the dishes, iron, clean the house, shop

for groceries and necessities, ride in a car, pay bills, count change, handle a savings account, use

a checkbook/money orders, handle money, read, watch TV, sew, put puzzles together, play games on the computer, talk to her mother on the phone, and fish. (Tr. 66-68, 372). She also indicated that she eats out frequently, was able to attend a magic show and a concert in Branson, and had just returned from a two and a half week trip to Kansas. (Tr. 66, 384). *See Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996) (ability to care for one child, occasionally drive, and sometimes go to the store); *Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996) (ability to visit neighbors, cook, do laundry, and attend church); *Novotny v. Chater*, 72 F.3d at 671 (ability to carry out garbage, carry grocery bags, and drive); *Johnston v. Shalala*, 42 F.3d 448, 451 (8th Cir. 1994) (claimant's ability to read, watch television, and drive indicated his pain did not interfere with his ability to concentrate); *Woolf v. Shalala*, 3 F.3d 1210, 1213-1214 (8th Cir. 1993) (ability to live alone, drive, grocery shop, and perform housework with some help from a neighbor). Clearly, this level of activity is inconsistent with a finding of disability.

Therefore, although it is clear that plaintiff suffers from some degree of pain and discomfort, she has not established that she is unable to engage in any and all gainful activity. *See Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) (holding that mere fact that working may cause pain or discomfort does not mandate a finding of disability); *Woolf v. Shalala*, 3 F.3d at 1213 (holding that, although plaintiff did have degenerative disease of the lumbar spine, the evidence did not support a finding of disabled). Neither the medical evidence nor the reports concerning her daily activities supports plaintiff's contention of total disability. Accordingly, we conclude that substantial evidence supports the ALJ's conclusion that plaintiff's subjective complaints were not totally credible.

22

Although plaintiff argues that the ALJ did not set forth reasons in the decision for discounting her credibility, the ALJ did acknowledge his duty to consider all alleged symptoms in accordance with the factors set forth in 20 C.F.R. § 404.1520 and SSR 96-8P. (Tr. 12). It is clear that the ALJ properly considered all of plaintiff's impairments, in combination, and determined that her subjective allegations were not totally credible when considered in light of the entire record. We find this to be a sufficient credibility finding. Contrary to plaintiff's contention, the ALJ is not required to explicitly discuss each *Polaski* factor. *See Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001) (holding that if the ALJ discredits plaintiff's credibility and gives a good reason for doing so, the court will defer to his judgement even if every factor is not discussed in depth).

Plaintiff also contends that the ALJ erred in his RFC analysis. It is well settled that the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence." *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000). The United States Court of Appeals for the Eighth Circuit has also stated that a "claimant's residual functional capacity is a medical question," *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000), and thus, "some medical evidence," *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam ), must support the determination of the plaintiff's RFC, and the ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace." *Nevland v. Apfel*, 2 04 F.3d 853, 858 (8th Cir. 2000). Therefore, in evaluating the plaintiff's RFC, *see* 20 C.F.R. § 404.154599(c), while not limited to considering medical evidence, an ALJ is required to consider at least some supporting evidence from a professional. *Cf. Nevland v. Apfel*, 204 F.3d at 858; *Ford v. Secretary of Health and Human Servs.*, 662 F. Supp. 954, 955, 956 (W.D.

23

Ark. 1987) (RFC was "medical question," and medical evidence was required to establish how claimant's heart attacks affected his RFC).

In the present case, the ALJ considered the medical assessments of two non-examining agency medical consultants, the testimony of a medical expert, plaintiff's subjective complaints, and her medical records. On September 9, 2004, Dr. Jordan, a non-examining, consultative physician, reviewed plaintiff's medical records and completed a physical RFC assessment. (Tr. 184-192). He determined that plaintiff could lift and carry 25 pounds frequently and 50 pounds occasionally, as well as sit, stand, and walk for about 6 hours during an 8-hour workday. Dr. Jordan also concluded that plaintiff could occasionally climb ladders, ropes, and scaffolds and frequently climb ramps/stairs, balance, stoop, kneel, crouch, and crawl. No other limitations were noted. (Tr. 184-192).

On October 2, 2004, Dr. Robert Bateen, a non-examining psychologist, prepared a mental RFC assessment. (Tr. 200-218). After reviewing plaintiff's medical records, he diagnosed her with major depression, social phobia, specific phobia, and pain disorder. He concluded that plaintiff would have mild limitations with regard to activities of daily living and concentration, persistence, and pace. Further, Dr. Bateen determined that she would have moderate difficulties maintaining social functioning; working in coordination with or proximity to others without being distracted by them; completing a normal workday or workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; accepting instructions and responding appropriately to criticism from supervisors; responding appropriately to changes in the work setting; and, setting realistic goals or making plans independently of others. Dr. Bateen stated that plaintiff's

24

concentration was "fairly intact and appears to be adequate for the timely completion of simple tasks without the need for inordinate supervision.  The claimant will do best at work where she need not deal extensively with the general public and where she need have no more than brief and superficial contact with coworkers and supervisors.  She could be capable of SGA in work settings where contact with others is minimal."  (Tr. 217).

Further, Dr. Monty Kuka, a psychologist, reviewed plaintiff's medical records and testified at the administrative hearing as a medical expert. (Tr. 387).  Based solely on plaintiff's testimony, Dr. Kuka opined that plaintiff would meet listing 12.04 for depression.  However, he indicated that her medical records did not support the same conclusion.  (Tr. 388).  Dr. Kuka concluded that there was an interaction between plaintiff's depression and her medical problems. (Tr. 389).  Utilizing only her medical records, he opined that plaintiff had mild limitations with regard to activities of daily living; social functioning; and, maintaining concentration, persistence, and pace.  He noted no episodes of decompensation. (Tr. 390).  Dr. Kuka stated that the records indicated that plaintiff had situational problems, and that she was doing pretty well in general, despite some severe stressors in her life.  Increases in sleep disturbance and a few instances of increased depression were reported, but nothing that would rise to the severity level alleged by the plaintiff.  (Tr. 391).

Based on this evidence, we believe that the ALJ's RFC assessment is supported by substantial evidence.  Although plaintiff does have both physical and mental limitations, the record makes clear that she remains capable of performing work-related activities.  In fact, plaintiff's attempts at work after her alleged onset date are some evidence to support the ALJ's findings that plaintiff is not disabled.  Likewise, the fact that plaintiff was able to travel, go out

25

to eat, and do some shopping is inconsistent with plaintiff's allegations that she can not be around others.  Therefore, the ALJ's RFC assessment will stand.

We also find that substantial evidence supports the ALJ's finding that plaintiff can still perform work that exists in significant numbers in the national economy.  The ALJ asked the VE to consider whether a hypothetical person with the following limitations could return to plaintiff's PRW or still perform work that exists in significant numbers in the national economy: a person of plaintiff's age, education, and vocational background who must be able to alternate among walking, standing, and sitting and can walk short distances up to 1/4 of a mile; stand a maximum of 30 minutes; sit for 30 minutes; lift 20 pounds occasionally and 10 pounds frequently; push, pull, and reach overhead occasionally; and, never climb ladders or scaffolds or perform activities requiring the repetitive use of the hands for either fine or gross motor skills throughout the course of an 8-hour workday.  From a mental standpoint, the ALJ also asked the VE to assume that the person could perform a routine, low stress, simple to semi-skilled job not requiring a lot of judgment, decision-making, or dealing with a large number of people, including coworkers, at any one time.  (Tr. 398-399).  The VE testified that such a person could return to plaintiff's PRW as an office clerk.  *See Long v. Chater*, 108 F.3d 185, 188 (8th Cir. 1997); *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996).  Accordingly, we find substantial evidence to support the ALJ's determination that plaintiff could still perform work that exists in significant numbers in the national economy.

The plaintiff contends that the ALJ erred in failing to specifically note the requirements of the position of officer clerk and to then make specific findings that plaintiff was capable of performing each of those activities.  We note, however, that plaintiff's description of her position

26

as office clerk was classified as light work in the Dictionary of Occupational Titles. (Tr. 118, 393). Because the position held by plaintiff required that she deal with a large number of people, the ALJ determined that plaintiff could only perform this position as it is generally performed in the national economy, not as she performed it. An individual is not disabled if they retain the capacity to perform either their past relevant work as it was actually performed, or as it is generally performed in the national economy. *Evans v. Shalala*, 21 F.3d 832, 833-834 (8th Cir. 1994) (quoting SSR 82-61 (1982)); *see also* 20 C.F.R. § 404.1560(b)(2). The Dictionary of Occupational Titles defines the position of general office clerk as light work. *See* DICTIONARY OF OCCUPATIONAL TITLES § 209.562.010, *at* www.westlaw.com. Accordingly, we find no error with the ALJ's determination that plaintiff can perform this position.

**Conclusion**

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the plaintiff benefits, and thus the decision should be affirmed. The undersigned further finds that the plaintiff's Complaint should be dismissed with prejudice.

DATED this 26th day of February 2008.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)